# State of Tennessee

# Office of the 9th District

# Attorney General



# Summary Report

# of the

# In-custody death of Tabatha Smith and

# Line-of-duty death of Deputy Robert John Leonard

Russell Johnson
9th District Attorney General
1008 Bradford Way
Kingston TN, 37763

**EXPLANATION OF SUMMARY AND DESCRIPTION OF THE FINAL REPORT:**

This Summary Report is intended to provide information to the families of the two deceased persons, the media, and the public at large, as well as interested parties and entities involved in the aftermath review of the circumstances leading up to the deaths of Deputy RJ Leonard and Tabatha Smith. The Final Report consists of the Tennessee Highway Patrol Critical Incident Report, as well as reports generated by the investigators from the 9th District Attorney General's Office and includes information from interviews from family members, members of law enforcement, and other persons. It includes radio recordings and CAD logs from Meigs County 911, data from Deputy Leonard's cell phone, and data from Deputy Leonard's personal Garmin GPS navigation device. It also includes information from the Knox County Forensic Center autopsies performed on both Leonard and Smith.

The autopsies have been under seal by court order but have been unsealed by separate order with the release of this Summary Report. The autopsies should be obtained directly from the Knox County Regional Forensic Center. The Tennessee Bureau of Investigation (TBI) files are confidential by state statute (TCA 10-7-504(a)(2). We have tried to redact personal information in the reports generated by our office and the Tennessee Highway Patrol (THP) Critical Incident Response Team (CIRT) Final Report as required by state and federal law.

The reports from our office and the THP CIRT Report, as described above, are available through the website tennesseeda.org/district-9/press .

**BACKGROUND:**

Meigs County is a rural county in East Tennessee and is one of the smallest of Tennessee's counties in both geographic size and population. It consists of 217 square miles and runs approximately 35 miles from roughly north to south with its western boundary being the Tennessee River. It is no more than ten miles wide at any point along its length. There are fewer than 13,000 residents in the county, the land is mainly classified as agricultural, and there are no large industries or other sources of significant tax revenue. Because of this, its Sheriff's Department is constantly underfunded. For instance, Meigs County Sheriff's Department had only eight full-time deputies on staff in February 2024. None of their patrol vehicles had in-car camera systems. None of their patrol deputies had body camera systems. None of the vehicles had factory GPS navigation systems. [1]

All of this is important for better understanding some aspects of the circumstances and facts described in this summary of the more lengthy and detailed investigative reports.

As a result of the limited number of deputies, only two sheriff's deputies patrol the entire county on most evenings, and sometimes only one is available. On the evening of Wednesday, February 14, 2024, Meigs County Deputy RJ Leonard, who had only been a law enforcement officer since November 5, 2023, was assigned to routine patrol covering the southern half of Meigs County, while Meigs County Deputy Ben Christian was assigned to routine patrol covering the northern half of Meigs County. That evening Deputy Leonard was driving a 2010 Ford Crown Victoria which was not his usual patrol car, as his regular vehicle was in the shop for repairs. [2]

1 | P a g e
Summary Report 9th DAG - Leonard and Smith
Case 1:24-cv-00151-DCLC-CHS    Document 81-4    Filed 03/10/25    Page 2 of 20
PageID #: 904

While on these lengthy evening patrols Sheriff Melton allows his deputies to stop off at their homes for dinner where they can also check in on their families. This is permitted by the Sheriff because of the lack of places to eat in the evening on long shifts and the amount of territory the deputies must cover. Thus, on this Valentine's Day, Deputy Leonard stopped in at his home located in the southern part of the county to have a late dinner and to see his wife and five children before they went to bed. [3]

This is where Deputy Leonard was as the circumstances began to unfold that would ultimately lead to the deaths of both Deputy RJ Leonard and Tabatha Smith, who was in Deputy Leonard's custody, when the patrol vehicle that Deputy Leonard was driving went into the Tennessee River. [4]

**TIMELINE:**

***The Call to Meigs County 911*** - At 9:30 pm Meigs County 911 (*hereinafter referred to as Dispatch or dispatch*) receives a call from a female and male driving across the Hwy 60 bridge. That call is transcribed in full below due to the importance of the call.

Dispatch: (male voice) Meigs County 911. Location and your emergency?

Caller: (female voice) We are at the Hwy 60 bridge.

Dispatch: Umm Hmm?

Female Caller: A man just tried to walk out in front of our vehicle on the highway right before you cross the bridge to go to Dayton.

Dispatch: Ok. So, it was on the Meigs County side going towards Dayton?

Female Caller: Yes, I mean, right before you get to the bridge.

Dispatch: Do you, or were you able to tell anything about him like what sort of clothes he was wearing, or anything?

Female Caller: Did he even have clothes on? [*apparently asking the male in their vehicle*]

Male in vehicle: He had a gray jacket or a gray hoodie on.

Female Caller: He said it looked like a gray jacket or a gray hoodie.

[*Other unrelated radio traffic comes into play here 'walking over' conversation. Dispatch operator is engaged in a separate communication.*]

Female Caller: [*apparently talking to male occupant of their vehicle*]...was it an older man? I couldn't even see it....

Male: No, it looked like an older 30s....

Female Caller: ...... she [*or 'he', not easy to understand*] mid20s to 30s?

[*Dispatch Operator, still talking on the other call, making this part hard to understand.*]

Female Caller: I don't know how the car behind us didn't hit him.

2 | P a g e
Summary Report 9th DAG - Leonard and Smith
Case 1:24-cv-00151-DCLC-CHS    Document 81-4    Filed 03/10/25    Page 3 of 20    PageID #: 905

[Dispatch Operator comes back to Female Caller.] Dispatch: What's your name, mam?

Female Caller: Sara [*last name not easily discernible*]

Dispatch: Alright, Miss. Sara, I will get an officer out there to go check it out, ok?

Female Caller: Alrighty, thank you. Do we need to turn and go back?

Dispatch: No. You're fine to keep going, mam.

Female Caller: Alright. Thank you.

Dispatch: Uh Huh.

Female Caller: Alright, Bye-bye.

***Dispatch Call to Deputy RJ Leonard*** - Dispatch then contacts Deputy RJ Leonard to tell him the following:

Dispatch: 807. I need you to be enroute to Highway 60. Have reports of a male in a gray hoodie, appears to be in his mid-20s or 30 jumping into traffic.

Deputy Leonard: 10-4, I'm enroute.

[*Dispatch then goes back to the other call about a welfare check on a patient with diabetes unrelated to the Highway 60 bridge call.*]

***Deputy Leonard's Response and Actions*** - Upon receiving the call from Dispatch, Deputy Leonard [*according to the 911 CAD*] reports going '*enroute*' at 9:32 pm. As explained later hereinbelow, GPS tracking shows that Leonard quickly proceeded towards the Highway 60 bridge location driving from his home the short distance to Highway 58, then taking Highway 58 southward before turning off Highway 58 and onto Gunstocker Road, to be able to take several backroads to reach Highway 60. [5]

Deputy Leonard (807) calls in for more information, but two separate calls are taking place that make it difficult to hear what is being said. According to the explanation from Dispatch, a part of the radio transmission is muffled due to separate communications occurring at the same time. It was during this segment that Deputy Leonard was asking for more information as to where on Highway 60 he was to locate the subject of the call.

Dispatch replies: Right as you go onto the bridge

Deputy Leonard: 10-4

[*Other unrelated radio traffic being heard*]

Deputy Leonard: 807... I'm 10-97... in the area [*which is the 10-code for 'in the area'*]

Dispatch: Copy. In the area.

Deputy Leonard: I made contact about half-way across the bridge. It's going to be a female party. Um, appears to be on some sort of drugs. [*Note that on the GPS data the location of the stop appears to be about 1/3rd of the way from the Meigs County side of the bridge*].

3 | P a g e
Summary Report 9th DAG - Leonard and Smith
Case 1:24-cv-00151-DCLC-CHS     Document 81-4     Filed 03/10/25     Page 4 of 20
PageID #: 906

Dispatch: 10-4. I show you with contact. [9:47 pm contact with person on bridge from CAD]

[*Other unrelated call*.]

Deputy Leonard:  …I've got a name and date of birth for you. It's a Tabatha Smith, 

Dispatch:  So we've got a return on a Tabatha M. Smith from Decatur.  She is revoked.  Clear NCIC local. [Meaning no currently outstanding warrants]

Deputy Leonard: 10-4 can you send me a picture of that, please? [Requested and was sent a photo on file of Tabatha Smith].

Dispatch: 10-4

Deputy Leonard: 807. One in custody. [9:54 pm from CAD]

Dispatch: Copy. One in custody.

Deputy Leonard: 807. I will be 10-15 enroute to the SO. My odometer doesn't work, so record my time. [S.O. meaning Sheriff's Office]

Dispatch: Copy. Could you repeat?

Deputy Leonard: My odometer doesn't work, so record my time.

Dispatch: Copy, show you 10-15 at 9:58 [9:58 pm 10-15 with prisoner from CAD.  --- 'Prisoner in custody' is 10-15].

Dispatch: Time of transport is 21:58. [Military time 21:58 converts to 9:58 pm]

At 10:03 [and 58 seconds] pm, the next transmission is from Deputy Leonard and it is the single word - "Water".

No further transmissions from Deputy RJ Leonard.


**The Arrest of Tabatha Smith and the Fateful Trip to the Jail** -

Deputy Leonard had limited information going into this situation.  The caller to Dispatch indicated some confusion as to the description of the person that was in traffic.  The subject, who we now know to be Tabatha Smith, was wearing clothing (according to the autopsy inventory) consisting of overalls, two long-sleeved shirts and a jacket. [6] The photos from Smith's body recovered at the scene make it difficult to determine their color and exact appearance, but the photos from the autopsy are more telling.  From those photos it appears as if the overalls were camouflage with shoulder straps.  The V-neck outer shirt appears to be almost a fluorescent blue or blue/green.  The second shirt underneath was a dark color or black.  The long-sleeved jacket appears to have a hood and is apparently dark blue.  All items are caked in mud in the photos from the scene. [7] The driver's license photo of Tabatha Smith provided in the investigative report shows a person with sharp facial features. She is listed as 5'8" and 161 lbs. on her driver's license.  The autopsy lists her at 65 inches and 154 lbs. [8]

**4 |** P a g e
Summary Report 9th DAG - Leonard and Smith
Case 1:24-cv-00151-DCLC-CHS     Document 81-4     Filed 03/10/25     Page 5 of 20     PageID #: 907

Soon after Deputy Leonard arrived on scene, he radioed that the subject "appears to be on some sort of drugs". Several minutes later he had taken this person into custody, a female known to law enforcement, Tabatha Smith. (See above transcription of radio dialogue).

Additionally, there was text messaging between Deputy Leonard and Deputy Ben Christian, who was the deputy on patrol in the north end of Meigs County. This messaging took place immediately before and after Deputy Leonard took Smith into custody. Deputy Christian, hearing Deputy Leonard on the radio running Smith's driver's license, name and date of birth to Dispatch, messages Leonard that "[Smith] is a habitual meth/fentanyl user." Deputy Leonard messages that "[Smith] is going to jail" and then adds that, "She is walking into traffic on the bridge" and that Smith "walked in front of [him] with [his] lights on" - meaning the headlights and emergency lights of Deputy Leonard's vehicle. [9]

Tabatha Smith has a lengthy history related to alcohol and drug use with disorderly conduct and public intoxication charges. [See summary of Tabatha Smith's criminal history with 29 separate charges, including one assault against a first responder in 3-4-2023]. The autopsy revealed that she had both methamphetamine and THC (marijuana) in her bloodstream. One of the interviews established that she may have been in a temporary on and off again 'homeless' situation at the time of her arrest as she had left her 'boyfriend's' residence days before. Several officers on the day of the recovery noted that for the last two- or three-nights Tabatha Smith had been sleeping at night behind the Dollar General Store in Birchwood a short distance from the Highway 60 bridge. She has children, but other interviews revealed she had not been in close or recent contact with family members. Her mother, who lived in an adjoining county, indicated that she had not seen her in over two years. [10]

Because of:

a) the report about the person jumping or running in and out of traffic on the highway bridge at night – including in front of the deputy's patrol car with multiple lights – and,

b) the deputy observing that she "appeared to be on some sort of drugs",

Deputy Leonard evidently determined that she was a danger to herself or others and needed to be taken into custody.

We know from not only common procedure for Meigs County Sheriff's Department, but also from observation of her body upon recovery at the scene and from the autopsy report, that Deputy Leonard placed handcuffs on Smith, cuffing her with her hands behind her for officer safety reasons, per policy, according to Meigs County Detective Cordus Waller. She was placed in the backseat of the patrol vehicle which has a cage protecting the driver/deputy from the suspect in custody. He proceeded towards Decatur radioing that he had subject in custody, and we know that he was headed to the jail because of his '10-15' response to Dispatch and the discussion about recording his time due to the fact the odometer in his vehicle did not work. This request to the dispatch operator is also standard procedure for transporting anyone, especially a female who is in custody.

We know from his personal GPS navigation device [see the further discussion about the GPS unit hereinbelow] that he U-turned on the bridge and headed back east on Highway 60. Instead of going

**5 |** P a g e
Summary Report 9th DAG - Leonard and Smith
Case 1:24-cv-00151-DCLC-CHS    Document 81-4    Filed 03/10/25    Page 6 of 20    PageID #: 908

all the way east on Highway 60 to the intersection with Highway 58 and then turning north towards Decatur, Deputy Leonard turned left off Highway 60 and onto Shadden Road, probably intending to take backroad shortcuts back over to Highway 58, much the same as how he had driven from his home over to Highway 60 and the bridge.

In looking at the satellite image and maps, (as well as driving it) Shadden Road makes a slight turn to the left where Blythe Ferry Road seems to join or junction with Shadden Road from an angle off to the right of Shadden Road. In effect, Shadden Road ends at this point and becomes Blythe Ferry Road leading towards the Tennessee River. There is no stop sign at this junction where Shadden Road 'ends' into what becomes Blythe Ferry Road because at this juncture Blythe Ferry Road looks entirely like an extension of Shadden Road. One needs to travel this road to better understand the situation being described. There is, however, a stop-sign on the right side of Blythe Ferry Road for traffic coming from the east as it meets Shadden Road at the described 'junction'. This stop sign would not have been a 'traffic control device' that would have applied to Deputy Leonard, whether his intention was to turn east to go towards Decatur or whether he continued west on Blythe Ferry Road towards the old ferry landing at the river. [11]

Thus, Deputy Leonard proceeded onto and around Blythe Ferry Road by-passing the right- hand turn onto Blythe Ferry Road that he should have taken to return to Decatur. It was noted by first responders and law enforcement officers, who responded to the situation that night when Deputy Leonard could not be reached, just how foggy it was and the low visibility conditions this created. [12] Perhaps with the poor cell service in this rural area his personal GPS device was not working or keeping his location current. [We confirmed the poor or total lack of cell phone service as you approached the river with our cell phones that morning and day, as well as on recent return trips to the scene.] We know that his GPS device was active when he was both going to and leaving the Highway 60 bridge. There is some limited information that we have gathered that indicates he was probably using his cell phone for navigation on the way to the scene. However, there is nothing in the data column of his phone on the navigation app (iOS Maps) after a 9:37 pm entry to indicate that he may have 'in-put' a specific location into his i-Phone navigation app when he was leaving the scene at the bridge. Once again, the sheriff's office vehicle that he was driving did not have factory navigation. [13]

We know from syncing the GPS navigation data with Deputy Leonard's cell phone data that, about **46 seconds before hitting the water**, Deputy Leonard texted his wife "Arrest". This was his way of letting his wife know that he would not be back by the house before she went to bed, according to his wife. Since his phone was found in the usual location in his vest pocket next to his chest, we assume after texting he returned the phone to that location. The wife texted back "Noice", [*according to his wife, an intentional misspelling*] and it was received on Deputy Leonard's phone at 10:05 (and 30 seconds) pm, but that was one minute and 32 seconds after Deputy Leonard was already in the water [remember the dispatch communication 'water' at 10:03 (and 58 seconds) pm]. **See Exhibit E.**

**The Search for Deputy Leonard** -

The recording from Dispatch, that was obtained and reviewed multiple times the night of the search, had Deputy Leonard radioing Dispatch this single word 'water', evidently as the vehicle went into the river. The recording had to be mechanically slowed down to even understand what he

**6 |** P a g e
Summary Report 9th DAG - Leonard and Smith
Case 1:24-cv-00151-DCLC-CHS    Document 81-4    Filed 03/10/25    Page 7 of 20    PageID #: 909

was saying. That information at least directed the search for certain to the river, as there was speculation that the suspect and/or a cohort of the suspect had overwhelmed Deputy Leonard and stolen his vehicle, either with or without him in it. This was one of the operating theories at that time.

Ultimately, a federal Homeland Security Agent, in conjunction with an FBI CAST 'team', and our DTF Deputy Director Brendan Deboer, triangulated Leonard's phone location that night as part of the search and rescue effort. They were finally able to direct the TWRA, whose officers were out on a TWRA boat under and around the Highway 60 bridge, to move upstream near the mouth of the Hiwassee River and the ferry landing to locate the submerged vehicle using sonar and an underwater ROV.

**Recovery of Deputy Leonard and Tabatha Smith** -

Recovery efforts had to wait until it was light and there were hours involved with divers putting hands on the vehicle and hooking the vehicle to the cables for the tow truck to pull it to the bank. The interior or the vehicle was full of mud and silt when pulled from the water. TBI, THP and TWRA had to inspect the vehicle for bodies. Only Smith's body was in the vehicle, so divers still had to look for Leonard. They eventually had to throw a drag line to recover Deputy Leonard and on the second sweep of the drag line they recovered him from the river not far from where the vehicle was originally located.

The Tennessee Highway Patrol, the Tennessee Bureau of Investigation, the Tennessee Wildlife Resource Agency and almost every surrounding county sheriff's office and local police agencies were involved in the search and recovery effort, including Monroe County and Hamilton County who had dive teams available. The immediacy and breadth of the response that night and next day by so many agencies, officers, agents and deputies was impressive.

Once the bodies were recovered, I requested the THP Critical Incident Response Team to take over the scene and lead the investigation along with assistance from TBI and my office, with Agent Cortney Dugger and Investigator Chanel Finnell from my office working directly with THP CIRT Sgt. John McFarland. The multi-agency investigation began with a visual examination of the scene, the vehicle, and the bodies. Several people had already been interviewed the previous evening and throughout the day. Autopsies were conducted at my request and have been under seal until we are providing orders to unseal the autopsy reports with the conclusion of the investigation and release of this Report.

During the search for Deputy Leonard, his vehicle was discovered upside down in the water with the front end on the bed of the river due to the weight of the engine. The rear of the vehicle was floating upwards at almost a 45-degree angle. The trunk lid was open as the impact from the crash into the water forced the trunk open. Tabatha Smith's body was recovered from the back seat compartment covered in mud and silt. Deputy Leonard's driver's side window was all the way down when it was pulled from the river without his body inside. Divers using a drag in the murky, dark water ultimately found his body submerged feet from where the vehicle was recovered.

**The Autopsy Results -**

7 | P a g e
Summary Report 9th DAG - Leonard and Smith
Case 1:24-cv-00151-DCLC-CHS    Document 81-4    Filed 03/10/25    Page 8 of 20 PageID #: 910

The autopsy reports determined that both Deputy Leonard and Tabatha Smith drowned. The toxicology report for Smith indicates that there was THC, methamphetamine and amphetamine in her system. She was also positive for caffeine and cotinine – the breakdown of nicotine in the body. The toxicology report for Leonard showed that he was positive for caffeine and cotinine as well, but no other drugs. There was no indication of trauma to either individual to suggest that some traumatic incident occurred, either during the arrest, or ongoing between the two while in the car. There was a cage separating the back seat from the front seat. The doors of the back seat could not be opened from the inside by Smith. It had to have been an unimaginable predicament for the handcuffed Smith who had no way of extricating herself from the backseat compartment with the vehicle underwater.

**Analysis of Investigation and Evidence** -

The evidence in this case consists mainly of the data discussed hereinbelow retrieved from devices, as well as the dispatch recordings, the interviews, personnel records of Deputy Leonard, criminal history of the subject, examinations of the vehicle and testing on the brakes and other aspects of the vehicle performed by Sgt. McFarland or others.

The TBI investigative file is confidential by statute TCA §10-7-504(a)(2), so it is not included in this report. In the report that is available we have tried to redact what is required by law to be redacted and we have used initials for some witness names. We have not included addresses for their privacy concerns. I think the most important evidence in the case is what we learned from the GPS navigation device, the radio dispatch and the text messaging.

We know the route that Deputy Leonard travelled both to the bridge and on his return, up to the point he drove his sheriff's department vehicle into the river at the end of Blythe Ferry Road because Agent Cortney Dugger from our office was able to locate Leonard's personal Garmin GPS navigation device in the floorboard of the vehicle post-recovery from the river. The process of drying, cleaning, and retrieving the data from this device is explained in his Report. [pp. 2-3, et seq]

We have the dispatch recording and CAD/call log from the evening and night of February 14, 2024, that was obtained from Meigs County 911 (Dispatch). Agent Dugger has described in his portion of the Report how he took the GPS data from Leonard's personal Garmin navigation device and 'married' it with the dispatch timeline to show where Deputy Leonard was at numerous data points with the calls as they came in or went to dispatch. The Tennessee Highway Patrol also describes in the CIRT report how they recovered and dried the personal cell phone of Deputy Leonard that was retrieved at the autopsy from his tactical vest that he was wearing that night when his body was recovered from the river. The phone was actually powered up for two days thereafter and the data retrieved therefrom can track the phone moving along with Leonard's body all the way to Knoxville for the autopsy.

All three forms of data (GPS, dispatch transmissions, and text messages) help to recreate the timeline of what happened as to location and communication. The GPS data gives MPH every few seconds. It shows that Deputy Leonard's vehicle was travelling at approximately 56 mph at 10:03:31pm [*hours/minutes/seconds*] on Blythe Ferry Road nearing the landing, then still at 56 mph at 10:03:39, and then the last moving datapoint is 44 mph at 10:03:45 pm when it is assumed that he hit the water, and then finally at 10:03:51 pm his vehicle is at 1.6 MPH, presumably the

**8 |** P a g e
Summary Report 9th DAG - Leonard and Smith
Case 1:24-cv-00151-DCLC-CHS    Document 81-4    Filed 03/10/25    Page 9 of 20 PageID #: 911

momentum of the vehicle moving into the river. All of this depends on how well the times on the GPS device and his cell phone are synchronized, or not. **See forensic reports of Agent Dugger.**

The THP CIRT report estimated an average speed of 42 mph between two points on Blythe Ferry as described in their CIRT Report. This is merely a measurement of distance and time to determine an average speed over the distance measured. The full THP CIRT report is available.

The collective reports and this Summary Report can answer many of the questions concerning what happened and to some extent how it happened. There are multiple factors to consider that have already been discussed or implied in this summary: lack of the deputy's familiarity with the area, reliance on technology that may not have worked effectively in an area with probably poor signal service, rural roads under nighttime darkness and foggy conditions, a person in custody whose historical conduct with law enforcement and her known drug condition may have led to behavior that caused driver distraction. But no one can say definitively why it happened.

**One Theory**

Deputy Leonard was new to patrolling Meigs County. He was originally from New York having lived there his entire life before moving to Tennessee around 2022. The portion of the Final Report on the GPS devices describes how we learned that he may have been on Blythe Ferry Road previously on at least two occasions, but presumably during the daylight hours. [14]

Persons reading this report who did not grow up or live most of their lives in Meigs County, or in similar rural areas of East Tennessee located near the Tennessee River, probably have no concept of a rural, two-lane road such as Blythe Ferry Road leading to an old ferry boat landing. Especially an old ferry road that does so without any gate or blockade to prevent someone driving a vehicle directly into the river. Keep in mind that Meigs County, until the last couple of years, has not changed much demographically since the days when ferries were operational and the only means of crossing the Tennessee River. The Highway 60 bridge was only completed in 1994. Meigs County includes at least three other ferry roads: Armstrong Ferry, Eves Ferry and Old Washington Ferry, that still run directly to the ferry landing and into the Tennessee River without any roadblocks or gates.

The vast majority of Meigs County's almost 13,000 residents were born and grew up in Meigs County with generations of family members before them likewise living their entire lives in Meigs County. Because of this generational familiarity with their county, they all know that Blythe Ferry Road terminates into the Tennessee River. They use the road as a 'boat ramp' to unload and load fishing boats, ski boats and other watercraft. They also swim and fish there.

Additionally, there is a state historic site near the landing commemorating the tragic events at the stockade once located there that was used by the federal government during the Trail of Tears removal of the Cherokee people. It has only been in the last couple of years since Covid that East Tennessee and, to a lesser extent Meigs County, have experienced an influx of folks from California, New York, Florida and the Midwest who are not usually familiar with how old ferry boat landings along the Tennessee River and other rivers are now utilized in this respect, or how roads with names ending in 'Ferry' are known to lead into a body of water where the old ferry boats once operated.

This may or may not have been the case with Deputy Leonard, but his lack of familiarity with this road, especially on a dark and foggy night with a person in custody, whose history and demeanor

9 | P a g e
Summary Report 9th DAG - Leonard and Smith
Case 1:24-cv-00151-DCLC-CHS    Document 81-4    Filed 03/10/25    Page 10 of 20    PageID #: 912

with law enforcement was one of drug and alcohol fueled disruption (one who had both Methamphetamine and marijuana in her system), may have played a role in this tragic event.

Regardless, Deputy Leonard (age 35) with Tabatha Smith (also age 35) in custody in the back seat, continued all the way down Blythe Ferry Road to its end and drove his vehicle into the Tennessee River where it submerged in the water some distance from where the road goes into the water. [15]

**Conclusion/Non-Conclusion -**

The only conclusion we can come to with any certainty is that this is a tragic accident for both Deputy RJ Leonard, Tabatha Smith and their families and friends. These are horrific circumstances, and their manner of death is difficult to imagine. Folks will take this information and speculate all that they want. I know that civil lawsuits have been and will be filed, but any amount of speculation or lawsuits will obviously not bring back RJ or Tabatha to their respective families, and this is the most grievous aspect.

This was a rough time, to say the least, for the Meigs County Sheriff's Office, the family of Deputy Leonard and, obviously, Tabatha Smith's family. The Meigs County community has suffered as a result of this tragedy, and still does to this day.

**Thanks to those that assisted in the search and recovery**

Many 'thanks' goes to THP CIRT Sgt. John McFarland of the Tennessee Highway Patrol and the Critical Incident Response Team. The Tennessee Bureau of Investigation (TBI) and the Tennessee Wildlife Resources Agency both participated in the search and the TBI assisted with the investigation. Agent Cortney Dugger and Investigator Chanel Finnell from my office played a large part in the investigation and preparation of this Summary Report.

The night, morning and day of the search and recovery saw law enforcement agencies from all counties and localities surrounding Meigs County respond. State and Federal agencies responded and helped in many different ways. Dive teams from Monroe County and Hamilton County responded or were available. Hamilton County Sheriff Austin Garrett and Monroe County Chief Deputy Sheriff Chris White proved invaluable in providing advice, marshalling resources and lending support to me and the collective efforts of law enforcement that night.

People not involved in law enforcement added to or offered help. The Oasis Revival Center there off Highway 60 in the Birchwood community provided food and drinks, and their facilities as a central command center. The local media was responsive to my early morning calls to cover the search and to ask the public for help in locating Deputy Leonard and his car in the hours before it was determined that Deputy Leonard's vehicle was in the Tennessee River just offshore of Blythe's Ferry Landing.

Thank you to all these fine folks and for the continued prayers for the law enforcement family of Deputy Leonard and the Meigs County Sheriff's Department, as well as the family of Tabatha Smith.

Russell Johnson

**10 |** P a g e
Summary Report 9th DAG - Leonard and Smith
Case 1:24-cv-00151-DCLC-CHS    Document 81-4    Filed 03/10/25    Page 11 of 20    PageID #: 913

9th District Attorney General (Loudon, Meigs, Morgan & Roane Counties)

FOOTNOTES –

1. Based on the general knowledge of the author of the summary, years of experience working with Meigs County Sheriff's Office as district attorney general, and from Meigs County Sheriff Jackie Melton - especially as to the number of deputies. Chief Deputy Malone noted that 11 full-time deputy positions were authorized but only eight were filled due to the difficulty in hiring law enforcement officers in rural areas with low pay and minimal benefits, as well as the recent 'anti-law enforcement climate' nationwide. As of November 2024, Meigs County is now up to twelve full-time deputies, but they still do not have in-car cameras, body cameras, nor factory installed GPS in their patrol vehicles.
2. Based on information from Meigs County Sheriff's Office and Chief Deputy Brian Malone. Deputy Leonard was a graduate of Cleveland State Community College law enforcement academy, according to his personnel file records which are in the reports. This is the same source for his start date at Meigs County Sheriff's Office.
3. Based on information from Meigs County Sheriff's Office and Chief Deputy Brian Malone and the widow of Deputy Leonard.
4. In this Summary I refer in almost every instance to the body of water at this location as the Tennessee River. It is also Chickamauga Lake because some distance downstream the Chickamauga Dam holds back the Tennessee River to create the embayment known as Chickamauga Lake. Just as some several miles north of this location the Watts Bar Dam holds back the Tennessee River to create the Watts Bar Lake embayment. At the location or point that we are interested in, the body of water appears more like a river than a lake, but either label is correct. Therefore, it makes better sense to refer to it as the Tennessee River.
5. **The GPS Device and Phone -** After an extensive search, Leonard's 2010 Police Crown Victoria was located in the Tennessee River near the end of Blythe's Ferry Road. According to Leonard's spouse, he had purchased a GPS device 'out of pocket' to use for navigation while on duty. The initial inventory of the vehicle concluded that there was no navigation system located in the vehicle. According to Leonard's spouse and MCSO Chief Deputy Malone, the vehicle that he was driving was not his usual patrol car as it was in the shop for repairs. Chief Malone confirmed that the GPS unit was not in the vehicle being repaired. On March 18, 2024, THP Sergeant John McFarland notified Agent Cortney Dugger from my office that he had seen a GPS unit while pulling the ECM and PCM from the vehicle Leonard drove into the river. On March 19, 2024, Agent Dugger picked up the Garmin 52 EX at the Chattanooga THP seizure lot. It was found lying in the driver's seat of the 2010 Crown Vic. Trooper Cameron Azbill transferred the device to the 9th District Attorney General's Office. This data was shared with THP CIRT. (See the section of the Report of Agent Dugger labeled Part 1 Garmin.) The iPhone belonging to Deputy Leonard was also recovered from his tactical vest at the autopsy. This phone was retrieved by THP CIRT and extracted by THP on 4/2/2024. This data was shared with Agent Dugger to filter the data covering the call and accident on 2/14/2024. (See the section of this report labeled Part 2 iPhone).
6. We were unable to check to see if the speedometer was working. We had THP CIRT Sgt. McFarland check the brakes, but he was unable to drive the vehicle that had been submerged. See CIRT report for further details and information.

11 | P a g e

Summary Report 9th DAG - Leonard and Smith
Case 1:24-cv-00151-DCLC-CHS    Document 81-4    Filed 03/10/25    Page 12 of 20
PageID #: 914

7. See the Autopsy Report of Tabatha Smith. The Autopsy Report mistakenly spells her first name as Tabitha. Also, you may refer to the THP CIRT Report of Findings, Paragraph No. 7 on Page 2 of 3 which states: Both Deputy Leonard and Smith did not survive the incident. An autopsy was conducted on each of them and the direct cause of death for both Deputy Leonard and Smith was reported as drowning. No other injuries or reasons were identified to explain their deaths. They were both tested for the presence of alcohol or drugs. Leonard tested negative for the presence of both alcohol and drugs. Smith tested negative for alcohol but tested positive for methamphetamines (38 ng/ml) and delta-9 carboxy THC (5.1 ng/ml). (Knox County Regional Forensic Center.) Also, **See Exhibits A and B.**
8. See photos of the scene of the recovered vehicle with Tabatha Smith's body. WARNING, these photos depict the body of a deceased individual which are highly personal and sensitive to family members and please do not share or place on social media, regardless of the reason you may have for accessing these photos.
9. Tennessee drivers license photo of Tabatha Smith and the page of the autopsy for with inventory of clothing. Obviously, the viewer of the photos can make their own conclusion as to the color of the clothing, but keep in mind that the caller to 911 was viewing this in a split second or matter of seconds at night with an individual wearing a jacket with a hood or a 'hoodie'. Also, **See Exhibit C.**
10. See the forensic report of Agent Cortney Dugger at pp. 47-48 for text messaging between Deputies Christian and Leonard.
11. **See Exhibit D** for local arrest history of Tabatha Smith, meaning arrest data pulled from Meigs County and other counties. This is not an NCIC criminal history, which reports are confidential. The local arrest report does not include outcomes or convictions.
**12.** The THP CIRT Report of Findings, Paragraph No. 1 on Page 1 of 3 states: In the area of the 'crash', Blythe Ferry Lane is a two-lane asphalt roadway with no shoulders. The roadway ends into the Tennessee River before transitioning into a concrete boat ramp. The roadway curves slightly left and then straightens, as it approaches the river. The roadway is set up for east and west traffic and the two travel lanes were separated by a double yellow centerline. Prior to reaching the water's edge, the centerline ended, and the asphalt roadway continued until the start of the concrete ramp. From the end of the centerline, the roadway transitioned to a downhill grade towards the water. There was no signage in the immediate vicinity of the water's edge, to warn or indicate the approaching end of the roadway. There were no speed limit signs erected on Blythe Ferry Lane between the river and the intersection with Shadden Road. (Crash scene and surrounding area.) **Also, See Exhibits F, G and H.**
13. See Agent Dugger's GPS analysis and detail in his forensic report.
14. See Agent Dugger's analysis of the THP CIRT phone data for timeline.
15. The THP CIRT Report of Findings, Paragraph No. 4 on Page 1 of 3 states: The vehicle was recovered from the river after being located on the bottom in an upside-down position, in approximately 17 feet of water, near the end of the boat ramp. (Crash scene and vehicle.)

# List of Exhibits

**Exhibit A Leonard Toxicology Report**



**NMS Labs**
200 Welsh Road, Horsham, PA 19044-2208
Phone: (215) 657-4900 Fax: (215) 657-2972
e-mail: nms@nmslabs.com
Robert A. Middleberg, PhD, F-ABFT, DABCC-TC, Laboratory Director

CONFIDENTIAL

## Toxicology Report

Report Issued 02/27/2024 08:11

To: 10511
Knox County Medical Examiner's Office
2761 Sullins Street

Knoxville, TN 37919

Patient Name: Leonard, Robert J
Patient ID: 240216-58
Chain: 240216-58
DOB:
Sex: Male
Workorder: 24070228

Page 1 of 2

### Positive Findings:

| Analyte | Result | Units | Matrix Source |
|---|---|---|---|
| Caffeine | Presump Pos | mcg/mL | 001 - Femoral Blood |
| Cotinine | Presump Pos | ng/mL | 001 - Femoral Blood |

See Detailed Findings section for additional information

Agency Case Number: 240216-58

### Testing Requested:

| Test | Test Name |
|---|---|
| 8052B | Postmortem, Expanded, Blood (Forensic) |

### Specimens Received:

| ID | Tube/Container | Volume/Mass | Collection Date/Time | Matrix Source | Labeled As |
|---|---|---|---|---|---|
| 001 | Gray Stopper Glass Tube | 9 mL | 02/16/2024 10:01 | Femoral Blood | 240216-58 |
| 002 | Lavender (Purple) Stopper Plastic Tube | 5.25 mL | 02/16/2024 10:01 | Femoral Blood | 240216-58 |

All sample volumes/weights are approximations.
Specimens received on 02/17/2024.

*Exhibit B Smith Toxicology Report*



**NMS Labs**  
200 Welsh Road, Horsham, PA 19044-2208  
Phone: (215) 657-4900 Fax: (215) 657-2972  
e-mail: nms@nmslabs.com  
Robert A. Middleberg, PhD, F-ABFT, DABCC-TC, Laboratory Director

**CONFIDENTIAL**

**Toxicology Report**

Report Issued 03/03/2024 16:00

To: 10511  
Knox County Medical Examiner's Office  
2761 Sullins Street  
Knoxville, TN 37919

Patient Name: Smith, Tabitha M  
Patient ID: 240215-842  
Chain: 240215-842  
DOB:  
Sex: Female  
Workorder: 24070248

Page 1 of 4

**Positive Findings:**

| Analyte | Result | Units | Matrix Source |
|---|---|---|---|
| Caffeine | Presump Pos | mcg/mL | 001 - Femoral Blood |
| Cotinine | Presump Pos | ng/mL | 001 - Femoral Blood |
| Nicotine | Presump Pos | ng/mL | 001 - Femoral Blood |
| Delta-9 Carboxy THC | 5.1 | ng/mL | 001 - Femoral Blood |
| Delta-9 THC | 0.76 | ng/mL | 001 - Femoral Blood |
| Amphetamine | 35 | ng/mL | 001 - Femoral Blood |
| Methamphetamine | 38 | ng/mL | 001 - Femoral Blood |

See Detailed Findings section for additional information

Agency Case Number: 240215-842

**Testing Requested:**

| Test | Test Name |
|---|---|
| 8052B | Postmortem, Expanded, Blood (Forensic) |

**Specimens Received:**

| ID | Tube/Container | Volume/Mass | Collection Date/Time | Matrix Source | Labeled As |
|---|---|---|---|---|---|
| 001 | Gray Stopper Glass Tube | 11 mL | 02/16/2024 10:00 | Femoral Blood | 240215-842 |
| 002 | Lavender (Purple) Stopper Plastic Tube | 10 mL | 02/16/2024 10:00 | Femoral Blood | 240215-842 |

All sample volumes/weights are approximations.  
Specimens received on 02/17/2024.

*Exhibit C Driver License Photo Smith*



*Exhibit D Arrest History Smith*

## Summary of Tabatha Smith's Arrest History

1. 05/17/2007- Bradley Co. Simple Poss Sch II, IV
2. 11/04/2009- Meigs Co. Simple Poss
3. 11/13/2009- Bradley Co. Agg. Burglary and Theft of Property
4. 04/01/2010-Meigs Co Driving while Impaired
5. 11/12/2010-Meigs Co. Driving while Impaired
6. 08/29/2012- Meigs Co. Criminal Impersonation
7. 10/01/2012-Meigs Co. Theft under 500
8. 05/01/2013- Meigs Co. Poss Drug Para, Unlawful Carry or Poss of a Weapon, Mfg./ Sell Del Sch II Meth x 2.
9. 07/10/2013- Rossville GA. Theft by Shoplifting
10. 07/29/2013- Meigs Co. Unlawful carry or possession of a weapon in commission of a felon
11. 09/14/2013- Meigs Co. Theft <500, Sch II, VI, IV, Poss drug Para and Criminal trespassing.
12. 09/18/2013 Meigs Co. Theft of Property, Illegal Possession/Frad use of credit card
13. 11/22/2013- Meigs co. Theft <500
14. 12/17/2013-Meigs Co. Disorderly Conduct
15. 12/15/2014- Meigs Co. Disorderly Conduct, Public Intoxication, Assault, Agg. Burglary.
16. 03/25/2015-Meigs Co. Misuse of 911, Public Intoxication, Evading Arrest, Resisting Arrest.
17. 01/08/2019- Meigs Co. Assault on Officer, Resisting Arrest and Disorderly Conduct.
18. 03/08/2019- Meigs Co. Criminal Impersonation, Public Intoxication and Agg. Criminal Impersonation.
19. 07/07/2020-Meigs Co. Public Intoxication.
20. 07/07/2021- Meigs Co. Public Intoxication.
21. 07/12/2021- Meigs Co. Public Intoxication.
22. 07/25/2021-Meigs Co. Agg. Criminal Trespassing, Criminal Trespassing
23. 07/10/2022-Meigs Co. Agg. Criminal Trespassing
24. 10/15/2022-Meigs Co. Public Intoxication
25. 11/25/2022-Meigs Co. Criminal Trespassing x 2
26. 03/04/2023-Meigs Co. Criminal Trespassing, Theft <1k, Assault Against 1st Responder, Resisting Arrest, Reckless Endangerment, Theft of Merchandise, Resisting Stop & Frisk
27. 07/10/2023- Meigs Co. Criminal Trespassing
28. 09/06/2023-Meigs Co. Meigs Co. Public Intoxication
29. 10/14/2023-Bradley Co. Public Intoxication

SMITH has several arrests for Child Support, VOP's and FTA that are not listed.

End of report: Criminal Investigator 9th District Attorney Office Chanel Finnell

15 | P a g e
Summary Report 9th DAG - Leonard and Smith
Case 1:24-cv-00151-DCLC-CHS     Document 81-4     Filed 03/10/25     Page 16 of 20     PageID #: 918

*Exhibit E Text Message with Leonard and his Spouse*

**RJ Leonard**   2/14/2024 10:03:12.000 PM
Arrest.

✓ Received
**Spouse**   2/14/2024 10:05:30.000 PM
Noice

*Exhibit F - Blythe Ferry as it appeared in the Mid-1990s With Highway 60 Bridge in the background*



*Exhibit G Blythe Ferry Road at the old Blythe Ferry Landing with Hwy 60 Bridge (Present Day)*



**16 |** P a g e
Summary Report 9th DAG - Leonard and Smith
Case 1:24-cv-00151-DCLC-CHS     Document 81-4     Filed 03/10/25     Page 17 of 20
PageID #: 919

**NOT BLYTHE FERRY -** *Exhibit H - Old Washington Ferry Landing with Road (Present Day) to show how there are other roads leading to old ferry landings, just like Blythe Ferry (Armstrong Ferry and Eves Ferry being two others)*



*Exhibit I*

*Police Academy Graduation photo of RJ Leonard    Social Media photo of Tabatha Smith*



**17 |** P a g e
Summary Report 9th DAG - Leonard and Smith
Case 1:24-cv-00151-DCLC-CHS    Document 81-4    Filed 03/10/25    Page 18 of 20
PageID #: 920

*Exhibit J Road Markings*



**18 |** P a g e
Summary Report 9th DAG - Leonard and Smith
Case 1:24-cv-00151-DCLC-CHS     Document 81-4     Filed 03/10/25     Page 19 of 20
PageID #: 921

*Exhibit K List of Leonard's Arrests as Charging Officer*

## Charging Officer on Subjects Listed Below:

| | |
|---|---|
| RS | 12/13/2023 |
| KS | 1/5/2024 |
| WB | 1/16/2024 |
| JW | 1/27/2024 |
| RE | 1/27/2024 |
| AM | 1/27/2024 |
| PJ | 2/1/2024 |
| WF | 2/10/2024 |

## Warrant Service on Subjects Listed Below:

| | |
|---|---|
| JB | 1/13/2024 |
| SO | 1/23/2024 |

**19 |** P a g e
Summary Report 9th DAG - Leonard and Smith
Case 1:24-cv-00151-DCLC-CHS    Document 81-4    Filed 03/10/25    Page 20 of 20
PageID #: 922