UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

TABATHA MARIE SMITH (deceased) (aka )
Tabatha Marie Colbaugh), by and through her )
surviving children Nathan Alexander Smith, JE )
through next friend JH, NR through next friend )
SR, and LC through next friend EH, )
                                              )
          Plaintiffs,                         )
v.                                            )     No. 1:24-CV-00151-DCLC-CHS
                                              )
MEIGS COUNTY and ESTATE OF ROBERT )
J. LEONARD (deceased), by and through Neal )
Pinkston as Administrator *ad Litem*,         )
                                              )
          Defendants.                         )

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendant the Estate of Robert J. Leonard's Motion

to Dismiss and Memorandum in Support [Doc. 107], Plaintiffs' Response in Opposition [Doc.

112], and Deputy Leonard's Reply [Doc. 115]. For the reasons below, the Court will deny Deputy

Leonard's motion.

**I. BACKGROUND**

This suit arises from a tragic accident that claimed the lives of Plaintiff Tabatha Marie

Smith and Defendant Deputy Robert J. Leonard one evening in February 2024. According to

Ms. Smith's surviving children ("Plaintiffs"), who have filed this suit on Ms. Smith's behalf,

Deputy Leonard, a former sheriff's deputy in Meigs County, Tennessee, had been called to

investigate a "disturbance" on the night of the accident. [Fourth Am. Compl., Doc. 102, ¶ 40].

After arriving at the scene on Tennessee Highway 60, Deputy Leonard allegedly arrested Ms.

Smith, cuffed her, and placed her in the back of his patrol vehicle. [*Id.* ¶¶ 44, 45, 48]. En route

to the Meigs County Jail with Ms. Smith, Deputy Leonard allegedly traveled on Blythe Ferry

Lane—a two-lane asphalt roadway that ends abruptly with a downhill grade into the Tennessee River. [*Id.* ¶¶ 27, 47, 60]. About ten minutes after apprehending Ms. Smith, Deputy Leonard allegedly drove his patrol vehicle into the river, and both he and Ms. Smith drowned. [*Id.* ¶ 24]. Deputy Leonard's body was found in the river, and Ms. Smith's body was found in the backseat of the patrol vehicle at the bottom of the river, with her hands still restrained in cuffs. [*Id.* ¶¶ 51–52].

While Plaintiffs acknowledge that no gates or barriers were present to prevent motorists from driving into the river, they claim that Deputy Leonard "ignore[d]" numerous warning signs posted at intervals along the roadway—including signs that read, "ROAD ENDS 1500 FT," "STOP," and "STOP AHEAD," [*id.* ¶¶ 30, 34, 35, 84]—and numerous rumble strips on the roadway leading to the river, [*id.* ¶¶ 31, 33, 36, 37, 84]. Plaintiffs further allege that Deputy Leonard's patrol vehicle had no speedometer, odometer, or any other navigational equipment, [*id.* ¶ 41], and that he was using his cellphone to send text messages and Facebook messages to his wife and to Ben Christian[1] in the moments before he struck the water, [*id.* ¶¶ 46, 48]. In addition, Plaintiffs allege that Ms. Smith was "very familiar" with Blythe Ferry Road and had warned Deputy Leonard that he was driving toward the river, but he ignored her warnings. [*Id.* ¶¶ 62, 127].

Plaintiffs now bring suit under 42 U.S.C. § 1983 against the estate of Deputy Leonard, whom Plaintiffs sue in his individual capacity, and Meigs County, alleging that they violated Ms. Smith's Fourteenth Amendment rights under the United States Constitution. Specifically, Plaintiffs allege that Deputy Leonard and Meigs County deprived her of a liberty interest and her bodily integrity (Count One) and that they failed to protect her (Count Two). [*Id.* at ¶¶ 79–

---

[1] Plaintiffs do not identify Ben Christian in their complaint.

2

107]. Plaintiffs also bring several state-law claims against Deputy Leonard's estate and Meigs County. Deputy Leonard's estate now moves to dismiss Plaintiffs' claims, and Plaintiffs oppose the estate's motion. Having carefully reviewed and considered the motion and the parties' arguments, the Court will now rule on them.

## II. LEGAL STANDARD

To withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the plaintiff pleads facts that create a reasonable inference that the defendant is liable for the alleged conduct in the complaint. *Id.* When considering a motion to dismiss under Rule 12(b)(6), the Court accepts the complaint's allegations as true and construes them in a light most favorable to the plaintiff. *Mixon v. Ohio*, 193 F.3d 389, 400 (6th Cir. 1999).

"[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," however. *Iqbal*, 556 U.S. at 678. A plaintiff's allegations must consist of more than "labels," "conclusions," and "formulaic recitation[s] of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (citation omitted); *see Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." (citation omitted)).

## III. ANALYSIS

Section 1983 permits a claim for damages against "[e]very person who, under color of [law], subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities

secured by the Constitution and laws." 42 U.S.C. § 1983. Because § 1983 has "a 'color of law' requirement," a defendant can be liable "only if state law, whether provided by statute or judicially implied, empowers him with some legal obligation to act." *Doe v. Claiborne County*, 103 F.3d 495, 512 (6th Cir. 1996) (citation omitted). A claim under § 1983 therefore consists of two elements: the defendant (1) must deprive the plaintiff of a constitutional or a federal statutory right and (2) must deprive the plaintiff of one of these rights while acting under color of state law (i.e., state action). *Id.* at 511. "Absent either element, a section 1983 claim will not lie." *Christy v. Randlett*, 932 F.2d 502, 504 (6th Cir. 1991).

A violation of a constitutional or federal statutory right is a prerequisite to a claim under § 1983 because § 1983 "does not confer substantive rights" on a plaintiff; rather it is merely a conduit through which a plaintiff may sue another to "vindicate rights conferred by the Constitution or laws of the United States." *Aldini v. Johnson*, 609 F.3d 858, 864 (6th Cir. 2010); *see Graham v. Connor*, 490 U.S. 386, 393–94 (1989) ("[Section] 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred." (quotation omitted)). "The first inquiry in any § 1983 suit" is therefore "to isolate the precise constitutional violation with which [the defendant] is charged[.]" *Baker v. McCollan*, 443 U.S. 137, 140 (1979); *see Graham*, 490 U.S. at 394 ("[A]nalysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." (citation and footnote omitted)).

In this case, Defendants' alleged constitutional violations fall under the Fourteenth Amendment, whose Due Process Clause forbids "any State [from] depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. A plaintiff may bring three types of § 1983 claims against a state actor under the Due Process Clause.

4

*Zinermon v. Burch*, 494 U.S. 113, 125 (1990). First, she may sue to vindicate a deprivation of any of her constitutional rights enumerated in the Bill of Rights, e.g., her right to free speech, her right to be free from unreasonable searches and seizures, etc.. *Id.* Second, the Due Process Clause "guarantees more than fair process," *Washington v. Glucksberg*, 521 U.S. 702, 719 (1997), and it "cover[s] a substantive sphere as well," *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 841 (1998), permitting a plaintiff to sue to vindicate an infringement of her substantive due-process rights, i.e., her right to life, liberty, and/or property, *Zinermon*, 494 U.S. at 125. And third, she may sue to vindicate a deprivation of her procedural due-process rights. *Id.* Plaintiffs' § 1983 claims on behalf of Ms. Smith make up the second type of claim.

**A. Count One: Deprivation of a Liberty Interest and Bodily Integrity**

In Count One, Plaintiffs claim that Deputy Leonard deprived Ms. Smith of a liberty interest, [Fourth Am. Compl., Doc. 102, at 11], and they describe that liberty interest as her right to "be free from the infliction of physical pain, suffering, and death and to not be harmed by the defendants without Due Process of Law," [*id.* ¶ 92]. The Court construes Plaintiffs' claim as one for the violation of her substantive due-process right to life and to be free from bodily injury. *See Lewis*, 523 U.S. at 837 (addressing plaintiffs' claim of "deprivation of [the decedent's] Fourteenth Amendment substantive due process right to life" (footnote omitted)); *Doe v. Claiborne County*, 103 F.3d 495, 508 (6th Cir. 1996) (stating that "[i]t is well established that persons have a fourteenth amendment liberty interest in freedom from bodily injury" (quoting *Webb v. McCullough*, 828 F.2d 1151, 1158 (6th Cir. 1987)).

In tandem with this claim, Plaintiffs allege that Deputy Leonard deprived Ms. Smith of her bodily integrity, and this alleged deprivation is also a substantive-due process claim. *See Mitchell v. City of Benton Harbor*, 137 F.4th 420, 430 (6th Cir. 2025) ("The substantive

5

component [of the Due Process Clause of the Fourteenth Amendment] bars the state from depriving people of certain protected rights . . . . Among these protected rights is the right to bodily integrity[.]"). The constitutional right to bodily integrity is "an indispensable right recognized at common law as the right to be free from . . . unjustified intrusions on personal security and encompass[ing] freedom from bodily restraint and punishment." *Id.* (internal quotation marks omitted) (quoting *Ingraham v. Wright*, 430 U.S. 651, 673–74 (1977)); *see Union Pac. Ry. v. Botsford,* 141 U.S. 250, 251 (1891) ("No right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others[.]").[2]

To ascend to the level of a substantive-due process violation under the Fourteenth Amendment, a state actor's deprivation of a person's life must "shock the conscience." *See Lewis*, 523 U.S. at 847 (recognizing that, in a case involving deprivation of the substantive due-process right to life, this right "is violated by executive action only when it 'can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense'" (quotation omitted)). The same is true for a state actor's deprivation of a person's bodily integrity. *See Guertin v. State*, 912 F.3d 907, 922 (6th Cir. 2019) ("We use the 'shock the conscience' rubric to evaluate intrusions into a person's right to bodily integrity." (citation omitted)). While negligence does not shock the conscience, "unjustifiable and intentionally injurious conduct does." *Mitchell v. City of Benton Harbor*, 137 F.4th 420, 430 (6th Cir. 2025) (citation omitted).

Plaintiffs do not allege in Count One that Deputy Leonard engaged in unjustifiable, intentionally injurious conduct—i.e., that he intended either to injure or kill Ms. Smith—so

---

[2] "Bodily integrity [claims] 'usually arise in the context of government-imposed punishment or physical restraint,' but that is far from a categorical rule," and these types of claims have "breadth." *Guertin v. State*, 912 F.3d 907, 919 (6th Cir. 2019) (citation omitted).

6

the Court, in reviewing the allegations surrounding his actions, will be dealing "not with th[is] extreme[]" but with conduct that is either negligent or somewhere between negligent and unjustifiable, intentional conduct. *Guertin*, 912 F.3d at 923. Conduct that comes within this middle ground, that is, the area between negligent and unjustifiable, intentional conduct—an area which the Sixth Circuit has described "the neighborhood of recklessness or gross negligence," *Mitchell*, 137 F.4th at 430—"'may or may not be shocking depending on the context,'" *Guertin*, 912 F.3d at 923 (quotation omitted). When a state actor's conduct ranges between negligence and unjustifiable, intentional conduct, the Court analyzes that conduct—again, in its context—to determine whether that state actor was "deliberately indifferent to a known risk of harm." *Mitchell*, 137 F.4th at 430–31; *see id.* at 432 ("Because Plaintiffs do not allege that the State officials acted with any intent to injure, we must consider whether they acted with deliberate indifference." (citation omitted)).

This analysis of deliberate indifference requires the Court to consider certain factors, including "(1) the voluntariness of the relationship between the government and the plaintiff, especially whether the plaintiff was involuntarily in government custody," "(2) whether the executive actor was required to act in haste or had time for deliberation," and "(3) whether the government actor was pursuing a legitimate governmental purpose." *Durham v. Estate of Losleben*, 744 F. App'x 268, 271 (6th Cir. 2018) (quoting *Hunt v. Sycamore Cmty. Sch. Bd. of Educ.*, 542 F.3d 529, 536 (6th Cir. 2008)); *see Guertin*, 912 F.3d at 924. "Essentially, the more voluntary the plaintiff-government relationship, or the less time the state actor has to deliberate, or the greater the extent to which the state actor is pursuing a legitimate end, the less" likely the Court "should deem a bodily injury or death caused by the state actor" as conscience-shocking. *Guertin*, 912 F.3d at 925 (quoting *Durham*, 744 F. App'x at 271).

7

In vying for the dismissal of Plaintiffs' claims, Deputy Leonard's estate maintains that these factors "weigh in favor of this Court concluding that Deputy Leonard's actions are much more aligned with negligence than any intent to injure." [Estate's Mot. to Dismiss, Doc. 107, at 9]. Under the first factor, Deputy Leonard's estate acknowledges that his interaction with Ms. Smith, who was a pretrial detainee, was "not voluntary," [*id.*], so this factor weighs in favor of Plaintiffs.

As for the second factor, Deputy Leonard's estate does not squarely address it, but even if it had, the Court would conclude that Plaintiffs have alleged sufficient facts under this factor too. When a law-enforcement officer "acts recklessly during a fast-paced car chase or amid a prison riot," for example, courts "are unlikely to find that he was deliberately indifferent to a known risk of harm," but when a law-enforcement officer has "time to consider [his] actions, but nonetheless subject[s] individuals to an unjustified risk of harm, [his] behavior is likely to offend the Constitution." *Mitchell*, 137 F.4th at 431 (citing *Lewis*, 523 U.S. at 851–53).

Deputy Leonard's actions, as alleged, match the latter scenario. He was not involved in a high-speed car chase; instead, he was transporting an already-restrained pretrial detainee to jail. For Deputy Leonard, "actual deliberation," "[a]s the very term 'deliberate indifference' implies," was both "practical" and "feasible" during his transport of Ms. Smith. *Lewis*, 523 U.S. at 851 (citation and footnote omitted). Indeed, a relatively lengthy stretch of roadway, several miles in length, separated him and Ms. Smith from the Tennessee River at the outset. During the roughly ten-minute drive on that roadway, Deputy Leonard allegedly passed and had the opportunity to observe numerous warning signs and rumble strips,[3] and he even had time to text his wife and message Mr. Christian on Facebook.

---

[3] Although Plaintiffs allege that the night of the accident was "foggy" with "low visibility," Plaintiffs do not allege that those conditions prevented Deputy Leonard from seeing the warning signs along the roadway. [Fourth Am.

And further cementing the plausibility of Plaintiffs' assertion that Deputy Leonard had "time to consider [his] actions" before subjecting Ms. Smith to "an unjustified risk of harm," *Mitchell*, 137 F.4th at 431 (citing *Lewis*, 523 U.S. at 851–53), Plaintiffs allege that Ms. Smith warned him that he was driving toward the open river but he dismissed that warning—an allegation that the Court must accept as true. So in short, Plaintiffs' allegations, accepted as true, support a plausible claim that Deputy Leonard "knew the [open river] was [there], had the occasion to deliberate, and yet 'pressed the gas pedal, ignored the [warnings],' and caused the fatal crash." *Durham*, 744 F. App'x at 272 (quoting *Browder v. City of Albuquerque*, 787 F.3d 1076, 1077 (10th Cir. 2015)). Plaintiffs have therefore pleaded facts that weigh in favor of their claim.

And finally, as to the third factor, Deputy Leonard's estate contends only that Deputy Leonard "was lawfully transporting a prisoner which is a legitimate government purpose." [Estate's Mot. to Dismiss, Doc. 107, at 9]. But again, the Court's analysis must be context-specific, and while a law-enforcement officer's pursuit of a legitimate governmental purpose "*normally* . . . does not shock the conscience . . . . acting merely upon a government interest does not remove [that officer's] decision from the realm of unconstitutional arbitrariness." *Guertin*, 912 F.3d at 926 (emphasis added) (citing *Hunt*, 542 F.3d at 543); *see Hunt*, 542 F.3d at 543 ("[W]e have held open the possibility that in extreme cases the governmental actor's choice to endanger a plaintiff in the service of a countervailing duty would be deemed arbitrary[.]").

---

Compl., Doc. 102, ¶ 40]. Instead, Plaintiffs allege that he actively "ignored" them. [*Id.* ¶ 84]. The Court accepts these allegations as true. *Mixon*, 193 F.3d at 400.

9

In asserting that Deputy Leonard's actions were constitutionally permissible simply because he was transporting a prisoner, his estate fails to confront numerous context-specific allegations, many of which the Court has already mentioned: the allegations that he ignored the warning signs along the roadway and the rumble strips, that he ignored Ms. Smith's verbal warnings that he was driving toward the open river, that he was texting and messaging others on his cellphone while driving, and that he was operating a vehicle that had no speedometer or other navigational equipment. *See* [Pls.' Resp., Doc. 112, at 8 ("[W]hile Defendant Leonard had a legitimate governmental purpose in transporting Ms. Smith to the Meigs County jail, that purpose was not furthered by his to [sic] decisions to text his wife, drive recklessly, text while driving, and ignore road signage and rumble strips all while driving a vehicle lacking a working speedometer and odometer.")]. His estate also fails to consider the context-specific allegation that Deputy Leonard's actions resulted in Ms. Smith's death. *See Guertin*, 912 F.3d at 924 ("Our focus instead is upon the entirety of the situation," including "the *type* of harm[.]" (emphasis added) (internal quotation mark and quotation omitted)).

Having failed to perform the necessary context-specific analysis under the third factor, Deputy Leonard's estate has not persuaded the Court that this factor favors the dismissal of Plaintiffs' claims. *See Mitchell*, 137 F.4th at 430–31 ("When conduct falls somewhere between the[] bookends . . . of recklessness or gross negligence . . . we evaluate the conduct *in context* to determine if the official was deliberately indifferent to a known risk of harm, for what may constitute a denial of fundamental fairness, shocking to the universal sense of justice, may, in other circumstances, and in light of other considerations, fall short of such denial." (emphasis added) (internal quotation marks and quotation omitted)). Nor has Deputy Leonard's estate persuaded the Court that the other factors favor dismissal, for the reasons that the Court has

10

already stated. So in weighing the three factors together, the Court concludes that Plaintiffs, at this stage, have plausibly alleged facts that "shock the conscience" and satisfy the deliberate-indifference standard, and their claims therefore survive dismissal.

### B. Count Two: Failure to Protect

Next, as to Plaintiffs' failure-to-protect claim, Deputy Leonard's estate raises only one argument: that this claim is not actionable because Plaintiffs bring it under the Fourteenth Amendment and not the Eighth Amendment. [Estate's Mot. to Dismiss, Doc. 107, at 6 n.3]. But as Plaintiffs rightly argue, the Eighth Amendment applies to state actors like Deputy Leonard through the Fourteenth Amendment's Due Process Clause, *Robinson v. California*, 370 U.S. 660, 675 (1962), and "[t]he Due Process Clause of the Fourteenth Amendment provides the same protections [in the Eighth Amendment] to pretrial detainees" like Ms. Smith, *Richmond v. Huq*, 885 F.3d 928, 937 (6th Cir. 2018) (citing *Richko v. Wayne*, 819 F.3d 907, 915 (6th Cir. 2016)), *abrogated on other grounds by Brawner v. Scott County*, 14 F.4th 585, 596 (6th Cir. 2021); *see Buetenmiller v. Macomb Cnty. Jail*, 53 F.4th 939, 945 (6th Cir. 2022) ("Because [Plaintiff] was a pretrial detainee at the time of the events in question, her [failure-to-protect] claim is governed by the Fourteenth Amendment, rather than the Eighth." (citations omitted)). Deputy Leonard's estate's argument—that Plaintiffs' failure-to-protect claim, as a matter of law, is not actionable under the Fourteenth Amendment—is contrary to Sixth Circuit precedent, and it does not warrant dismissal of Plaintiffs' claims.

### C. Counts Three through Nine: The State-Law Claims

Lastly, in pursuing dismissal of Plaintiffs' state-law claims, Deputy Leonard's estate's sole argument is that the Court should decline to exercise supplemental jurisdiction over those claims because Plaintiffs' federal claims require dismissal. [Estate's Mot. to Dismiss, Doc. 107,

11

at 10]. The Court rejects this argument, having determined that Plaintiffs allege plausible claims for relief under § 1983.

## IV. CONCLUSION

For all these reasons, Deputy Leonard's Estate's Motion to Dismiss and Memorandum in Support [Doc. 107] is **DENIED**. His estate is **ORDERED** to serve a responsive pleading by **Monday, July 20, 2026**.

**SO ORDERED:**

s/ Clifton L. Corker
United States District Judge

12