# UNITED STATES DISTRICT COURT
## IN THE EASTERN DISTRICT OF TENNESSEE AT CHATTAGNOOGA

Estate of Tabitha Marie Smith v Meigs County, et al
Case # 24-cv-151-DCLC-CHS

### Plaintiff's Supplemental Expert Report - Thomas J. Tiderington
July 28, 2026

**INTRODUCTION:**

My name is Thomas J. Tiderington, and I was retained by Robin Flores and Attorneys from the Oliver Law Group (Michigan), representing the plaintiffs in this case. My expert report dated June 22, 2026, detailed my opinions on this matter. Subsequently, I was provided with additional materials to review which form the basis for this supplement. The additional materials do not change the opinions contained in my original report. However, the additional materials do provide the opportunity to further support and elaborate on my opinions.

> 📄 04-28-26 Sheriff Melton_FullSize
>
> 📄 04-29-26 Sgt Owens_FullSize
>
> 📄 05-13-26 Deputy Ben Christian_FullSize (1)
>
> 📄 06-16-26 30(b)(6) - Malone_FullSize

Therefore, I incorporate by reference my initial report from June 22, 2026, in its entirety. As in my initial report, references to documents and testimony herein are meant to provide examples of supporting information but are not intended to be comprehensive or an exhaustive list of all known supporting information. The information in this report is based on discovery to date and the information that is currently available.

**OPINION: Lack of Training and Guidance Regarding Distracted Driving and Cell Phone Use During Prisoner Transport - MCSO's failure to regulate and/or train deputies against distracted driving while transporting prisoners.**

Police agencies throughout the country are acutely aware of the devastating impact that distracted drivers have on public safety, as driver behavior accounts for 90% of traffic collisions nationwide (Hall et al., 2020).[1] However, as highlighted in Police Chief Magazine, the exact same risks hold true for law enforcement officers themselves. Far from being immune to the

---

[1] Howard B. Hall, Janet Brooking, and Rich Jacobs, "Law Enforcement's Role in Distracted Driving: Helping to Keep Our Roadways and Officers Safe," Police Chief Online, September 23, 2020.

hazards of distraction, police officers face heightened operational risks due to the unique electronic environment of modern patrol vehicles. In addition to personal cell phones and mobile devices, officers operate in cockpit-like environments equipped with mobile data terminals (MDTs), police radios, speed radar, and emergency controls. Research conducted by the University of Washington demonstrates that law enforcement drivers possess no special skill to mitigate these distractions; when subjected to text-based distractions, experienced officers exhibited significantly greater lane deviation, unintended lane departures, and increased braking latency (Hall et al., 2020).

**Policies:** *The foundation for managing risk and guiding critical tasks is good policy. It would be hard to find a law enforcement agency that doesn't have a policy and procedures governing emergency driving, pursuits, and other scenarios involving vehicles. It is important that distracted driving, particularly the use of handheld devices, be addressed in these policies.*

*Consider the following:*

- *Communications during an emergency response should be limited to radio transmissions. There is no reason for personnel to be using a handheld device while driving in an emergency mode.*
- *While more states are passing "hands-free" laws that prohibit the use of handheld devices while driving, some provide exemptions for law enforcement. The use of these exemptions should be limited. There are very few situations that would require the use of a handheld device while driving.*
- *Drivers should be directed to pull off the roadway when handheld devices must be used. During normal patrol activities or even during response to non-emergency calls, this should not create a significant inconvenience.*
- *The acceptable use of personal devices should be addressed. These devices are difficult to limit; however, there is no reason for their use while the vehicle is in motion.*

*Law enforcement officers must provide a positive example of safe driving for the public. The use of handheld devices by officers sets a contrary example for other drivers and diminishes the effectiveness of education initiatives.[2]*

Consequently, law enforcement leadership has an affirmative duty to establish clear policies, such as requiring officers to pull off the roadway before using handheld devices and restricting mobile communications during emergency or transport operations, backed by frequent training to prevent predictable disorientations and fatal collisions.[3]

Sheriff Melton testified that MCSO maintains no written policies specifically governing deputy cell phone use, texting, or radio communications while on duty or actively transporting prisoners in the backseat (Melton Dep. at 84:8–14; 85:8–11; 102:5–9). Sheriff Melton explicitly admitted

---

[2] ibid

[3] Howard B. Hall, Janet Brooking, and Rich Jacobs, "Law Enforcement's Role in Distracted Driving: Helping to Keep Our Roadways and Officers Safe," Police Chief Online, September 23, 2020.

that MCSO provides zero training instructing deputies to pull over and bring their vehicle to a complete stop before texting on a mobile device (Melton Dep. at 94:1–5). Given evidence indicating that Deputy Leonard was texting shortly before driving off the boat ramp, this total lack of distracted driving policy and training represents an operational failure that significantly heightened the risk of fatal driver disorientation.

*Sheriff Jackie Melton's deposition testimony directly reinforces your original expert opinion that the Meigs County Sheriff's Office (MCSO) suffered from a systemic lack of supervisory oversight, administrative management, and policy enforcement. During his testimony, Sheriff Melton acknowledged that he has completely abdicated responsibility for creating, drafting, or managing operational policies, testifying under oath that Chief Deputy Brian Malone is solely responsible for creating department policies (Melton Dep. at 11:13–16). Furthermore, when questioned regarding Deputy Leonard's training records, Sheriff Melton admitted he possessed no direct knowledge and deferred all training oversight to Chief Malone (Melton Dep. at 64:18–19). Demonstrating a broader pattern of administrative disinterest in command governance, Sheriff Melton conceded under oath that he had not even reviewed the Fourth Amended Complaint filed against his department in this lawsuit prior to his deposition (Melton Dep. at 64:2–7).*

**OPINION:  Absence of a Structured, Documented Field Training Program (FTO)**

Sheriff Melton's testimony provides factual support that Deputy Leonard was deployed into solo patrol and prisoner transport without an adequate, structured, or documented field training evaluation. Under examination, Sheriff Melton admitted that MCSO does not provide Field Training Officers (FTOs) with any standardized checklists or performance rubrics to ensure that a trainee has demonstrated proficiency in core police duties before being released to solo duty (Melton Dep. at 61:5–11). When asked what specific documentation exists regarding the field training Deputy Leonard received prior to the fatal incident, Sheriff Melton confirmed that "the ride-along" was the only training of which he was aware, once again deferring all administrative knowledge of trainee evaluation to his Chief Deputy (Melton Dep. at 64:15–19).

Widely known and accepted police practices throughout the United States require law enforcement agencies to establish a formal, structured Field Training Officer (FTO) program, such as the widely accepted San Jose FTO model, to bridge classroom academy instruction and solo patrol duty. Law enforcement agencies that properly train and supervise their officers utilize standardized daily observation reports (DORs), objective task completion checklists, and performance evaluation rubrics. These formal evaluation mechanisms require certified FTOs to document, track, and verify a trainee's demonstrated competency across critical job functions, including nighttime navigation, emergency vehicle operation, geographic familiarity, and safe prisoner transport protocols.

In stark contrast to accepted professional standards, Sheriff Melton admitted under examination that MCSO does not provide FTOs with any standardized checklists, written evaluation forms, or performance rubrics to ensure that a trainee has demonstrated proficiency in core police duties before being released to solo duty (Melton Dep. at 61:5–11). When asked what specific documentation exists regarding the field training Deputy Leonard received prior to the fatal incident, Sheriff Melton confirmed that "the ride-along" was the only training of which he was aware, once again deferring all administrative knowledge of trainee evaluation to his Chief Deputy (Melton Dep. at 64:15–19). Deploying a probationary officer into high-risk solo operations without a structured FTO program or documented competency evaluations represents a severe administrative failure and a departure from widely known and accepted law enforcement operating procedures.

Additionally, the record indicates that the MCSO fails to maintain even accurate basic records as to how many days Deputy Leonard received ride along training. When Chief Deputy Malone was asked how many days of ride-along training that Deputy Leonard received, he testified that "[]t was right at two weeks." (Malone 30(b)(6) Dep., 30:5-30:8).

Chief Deputy Malone further testified that the only people who provided ride along training to Deputy Leonard were Deputies Christian and Owens.  (Malone 30(b)(6) Dep., 42:15-42:18). However, timecards for Deputies Leonard, Owens, and Christian demonstrate that Robert Leonard only worked the same shift as Deputies Chrisitan and Owens for his first seven days after being hired by the MCSO.[4]

**Unauthorized and Unregulated Use of Secondary Navigation Equipment**

Sheriff Melton confirmed that MCSO does not formally authorize or approve the use of third-party navigation devices, such as Garmin GPS units, for deputies on duty (Melton Dep. at 94:6–9). He explained that if Deputy Leonard was utilizing a Garmin device during the fatal night shift, he was doing so entirely on his own initiative without department clearance, standardization, or training (Melton Dep. at 94:10–11). Allowing junior officers to rely on unvetted, secondary electronic navigation tools without established operational protocols or spatial awareness training creates severe distraction risks and increases geographic confusion during nighttime emergency responses and transports.

Had Deputy Leonard participated in a structured, formal FTO program, where a certified trainer actively observes, evaluates, and corrects a recruit's operational habits during patrol shift rotations, this issue may have been identified, addressed, and corrected prior to his deployment to solo duty. Allowing junior officers to rely on unvetted, secondary electronic navigation tools without FTO oversight, established operational protocols, or spatial awareness training creates severe distraction risks and significantly increases geographic confusion during nighttime emergency responses and prisoner transports.

---

[4] Meigs County's Response to Plaintiffs JE, NR, and LC's Second Requests for Production, Item 7.

**Deposition Summary and Analysis: Sergeant Willis Owens**

Sergeant Willis Owens is a POST-certified law enforcement officer employed by the Meigs County Sheriff's Office. Within the department's shift and sector assignments, Sergeant Owens was primarily assigned to patrol and supervise the north end of Meigs County. In addition to his primary patrol responsibilities, Sergeant Owens served as an informal trainer assigned to ride with newly hired recruits during their initial orientation phase. However, Sergeant Owens testified under oath that he was never sent to a Field Training Officer (FTO) school, held no FTO certification, and was provided with no written FTO manual, daily observation reports (DORs), or standardized evaluation rubrics by MCSO command staff. Furthermore, Sergeant Owens routinely utilized a personal, secondary Garmin GPS unit in his patrol vehicle to assist with navigation across rural county routes due to limited map availability and frequent cellular/radio dead zones.

Sergeant Owens' direct professional interaction with Deputy R.J. Leonard was limited to serving as his primary "ride-along" officer for approximately three (3) days in December 2023, prior to Deputy Leonard being released to solo patrol. During these three days, Sergeant Owens allowed Deputy Leonard to observe patrol operations and drive the patrol unit under his verbal guidance. Because Sergeant Owens' designated zone of responsibility was strictly the north end of Meigs County, all three days of Deputy Leonard's training with Sergeant Owens were conducted exclusively in the northern sector.

Consequently, Sergeant Owens never drove Deputy Leonard through the south end of the county, never showed him Blythe Ferry Lane or the Blythe Ferry boat ramp, and provided zero instruction, warnings, or hazard awareness training regarding unlit roadways that terminate directly into the Tennessee River. Sergeant Owens completed no written evaluations, checklists, or formal performance rubrics documenting Deputy Leonard's driving competency, spatial awareness, or geographic familiarity, providing only informal verbal feedback to departmental leadership before Deputy Leonard was assigned to solo night-shift patrol.

**Deposition Summary and Analysis: Sergeant Benjamin Christian**

The deposition testimony of Sergeant Benjamin Christian (taken May 13, 2026) provides further details of regarding the operational and administrative failures within the Meigs County Sheriff's Office (MCSO). Like Sergeant Owens, Sgt. Christian served as one of Deputy R.J. Leonard's informal trainers during his brief pre-deployment ride-alongs. Sgt. Christian's testimony confirms that MCSO lacked a structured Field Training Officer (FTO) evaluation system, provided no formal training on geographic hazards or route safety, and operated without documented performance metrics.

Sergeant Christian was never certified as a Field Training Officer (FTO), had received no instructor training, and was provided no formal training curriculum, daily evaluation forms, or written performance checklists by MCSO leadership. His interactions with Deputy Leonard

5

Supplemental Expert Report - Thomas J. Tiderington & Associates, LLC

consisted of approximately four days of informal ride-alongs in the southern part of the county. Although Sergeant Christian drove down Blythe Ferry Lane with Deputy Leonard on one occasion during these ride-alongs, he provided no specific warnings, hazard instruction, or formal guidance regarding the danger of the Blythe Ferry boat ramp or other roadways terminating abruptly into the Tennessee River.

Sergeant Christian's testimony further MCSO's failure to train recruits on distracted driving hazards, route planning, and the safe operation of in-car electronic devices. Sergeant Christian confirmed that during Deputy Leonard's ride-alongs, no formal instruction or guidance was provided regarding cell phone usage, texting while driving, or secondary electronic navigation tools. Had MCSO instituted a structured FTO program with certified trainers, an FTO would have actively observed, evaluated, and corrected Deputy Leonard's visual scanning, multi-tasking habits, and reliance on secondary navigation screens during nighttime operations. Leaving inexperienced deputies to manage electronic distractions while navigating dark, unfamiliar corridors without mandatory safety protocols significantly heightened the risk of driver disorientation during prisoner transport.

<u>Self-Procured Navigation and Mobile Equipment:</u>  Sergeant Christian testified that deputies routinely purchased off-the-shelf electronic equipment, including personal cell phone mounts, secondary GPS/Garmin navigation units, and mobile accessories, with their own funds to use on duty. Because MCSO did not equip all patrol vehicles with standardized, integrated navigation systems or secure device mounts, individual officers relied on personal retail devices to navigate rural routes and manage emergency calls.  Christian acknowledged that the department had no specific written policies or training protocols governing how or when over-the-counter electronic devices could be manipulated while a patrol vehicle was in motion. There was no departmental directive requiring officers to bring the vehicle to a complete stop before interacting with personal secondary screens or mobile accessories.

## Conclusion

In conclusion, the testimonies of Sheriff Jackie Melton, Sergeant Willis Owens, and Sergeant Benjamin Christian further validate my original opinions while providing additional support for my supplemental findings regarding the organizational failures of the Meigs County Sheriff's Office. What occurred on February 14, 2024, was not merely an isolated operational error by a rookie deputy, but the predictable culmination of systemic administrative neglect. By failing to establish a structured, certified Field Training Officer (FTO) program with standardized evaluation metrics, MCSO deployed Deputy Leonard into solo night-shift patrol without verifying his operational readiness or geographic competency. This lack of structured oversight directly allowed uncorrected operational hazards to persist, most notably, Deputy Leonard's complete unfamiliarity with high-risk roadway points like the Blythe Ferry boat ramp, as well as his reliance on unvetted, self-funded over-the-counter navigation electronics. Combined with the department's total absence of distracted driving policies, mobile device restrictions, or safety protocols during prisoner transport, these administrative omissions created an environment of

severe spatial disorientation and visual distraction. Had MCSO implemented standard law enforcement training practices, comprehensive hazard orientation, and clear operational policies, the tragic deaths of Deputy Leonard and Ms. Tabitha Smith could have been prevented.

I have provided my opinions based on my training, experience, and my review of thousands of pages of records and hours of video footage in this case. I applied generally accepted police management principles and methods. I hold the opinions set forth above to a reasonable degree of professional certainty and based on longstanding and well-accepted law enforcement practices. Again, if additional information is presented to me, I am happy to consider it. I reserve the right to correct, supplement, or modify this report and my opinions expressed in the report.

*Thomas J. Tiderington*

*/s/Thomas J. Tiderington*

July 28, 2026

Supplemental Expert Report - Thomas J. Tiderington & Associates, LLC